Case 4:14-cv-00405   Document 59   Filed in TXSD on 05/26/16   Page 1 of 9

United States District Court
Southern District of Texas
**ENTERED**
May 26, 2016
David J. Bradley, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| BOSTON SHIP REPAIR LLC, | § | |
| | § | |
| Plaintiff, | § | |
| VS. | § | CIVIL ACTION NO. 4:14-CV-405 |
| | § | |
| OCEAN SHIPS INC, | § | |
| | § | |
| Defendant. | § | |

## OPINION AND ORDER

Before the Court is Ocean Ships, Inc.'s ("OSI's") Motion for Partial Summary Judgment (Document No. 49) and Boston Ship Repair, LLC's ("BSR's") Motion for Partial Summary Judgment Related to Surface Preparation (Document No. 50). Each party has also filed a Response (Document Nos. 53, 54) and a Reply (Document Nos. 55, 57). Having considered these filings, the facts in the record, and the applicable law, the Court concludes that OSI's Motion for Partial Summary Judgment (Document No. 49) is GRANTED and BSR's Motion for Partial Summary Judgment (Document No. 50) is DENIED.

**Background**

BSR has filed breach of contract claims against OSI regarding two main issues: scope of painting and surface preparation and the allotment of adverse weather days.[1] (Document No. 49 at 1). In November 2012 the parties entered into a Ship Alteration Contract regarding the USNS Soderman and the USNS Charlton[2] (the "Contract"). (Document No. 49, Exhibit J). One of the work items to be performed by BSR on the USNS Soderman included Work Item 150 ("Item 150") entitled "Superstructure and Freeboard Painting." (Document No. 49, Exhibit B).

---

[1] The weather days are not at issue in these motions.
[2] Repairs to the Charlton are not at issue here.

The disagreement between the parties centers on whether Item 150 required full surface preparation of approximately 269,538 square feet of freeboard and superstructure, regardless of the condition of the coating. OSI alleges that full surface preparation of all 269,538 square feet was required, while BSR insists that it was contractually obligated to do full surface preparation *only* on portions of the paint which were deteriorated and non-adherent. (Document No. 49 at 1; Document No. 50 at 2). BSR states that "Item 150 always included the *possibility* of surface preparation over the entire 269,538 SF of freeboard and superstructure surface area," but only if all 269,538 SF were deteriorated. (Document No. 54 at 3-5). OSI believes that the Item 150 requires surface preparation to all 269,538 SF, regardless of the condition of the paint. (Document No. 53 at 10-11).

The relevant portions of Item 150 (which was prepared by OSI) state that:

7.6.6 Upon completion of water washing, the Contractor, PPG Representative and OSI Port Engineer shall survey the freeboard and superstructure to determine final square footage of area requiring surface preparation and recoating. Contractor shall provide a condition report detailing the agreed upon square footages.

7.6.7 Contractor shall perform surface preparation to the areas agreed upon in paragraph 7.6.6 to SSPC-SP-12/WJ-2/M, UHP Water Jetting, as defined by GTRs and reference 2.1.6.

(Document No. 49, Exhibit B, at 150-4). The final portion of Item 150 contains a "Pricing Breakdown" which contains descriptions of the work to be done and the relevant square footage. *Id.* at 150-9. The "Surface Preparation and Cleaning Portion" lists:

| | |
|---|---|
| Mask all vulnerable surfaces and equipment | 1 lot |
| Fresh water washdown | 274,538 |
| **UHPWJ SSPC-SP-12 WJ-2 M[3]** | **269,538** |
| Chloride Testing 180 Power Tool Clean to bare metal SSPC-SP-ll | 5,000 |

---

[3] Both parties agree that this is the "removal to bare metal via ultra high pressure water jetting," also referred to as "full surface preparation." (Document No. 53 at 10-11).

*Id*. BSR bid that the entirety of the work in Item 150 would cost $1,149,922. (Document No. 49, Exhibit E, at OSI 25362). Specifically, item UHPWJ SSPC-SP-12 WJ-2 M would cost $401,727. *Id*. at BSR0012792. Below the Pricing Breakdown there is a Note stating:

> The above requirements are the best estimate of what steps will be required. Subsequent to a survey in accordance with paragraph [7.6.6[4]] a change order will be issued to definitize pricing of this item based on the total square footage to be surface prepared utilizing UHP, abrasive and/or mechanical cleaning and spot coated. Prices for any changes will be prorated based on the unit prices quoted on this table for either increases or decreases in the scope of work.

(Document No. 49, Exhibit B, at 150-9). Additionally, section 8.2 of the Contract states that, "The prices offered by the Contractor to complete all items of work outlined in the Specifications whether or not stated therein are to include all labor, services, material, equipment, removals…." (Document No. 49, Exhibit J, at 16). The Contract also provides that "The scope of all Work is to be limited to that laid out in the Work Package for each respective Vessel and no additions or changes are to be made without the specific approval of OSI's representative." *Id*. at 5.

OSI states that it "believed the entire amount of work specified in Item 150 would be required on the USNS Soderman," but still participated in the survey called for in Section 7.6.6 of Item 150. (Document No. 49 at 7). After the survey "OSI remained convinced that the entire amount of surface preparation and painting identified in Item 150 should be completed." *Id*. BSR states that the parties failed to come to an agreement after the survey, and thereafter OSI's port engineer required BSR to remove all of the paint, "regardless of whether the existing coatings were intact." (Document No. 50 at 18-19).[5] BSR therefore filed a breach of contract[6] claim against OSI, alleging that OSI breached the contract by failing to "follow the express provisions

---

[4] The document actually states paragraph 7.5.5, but the parties agree that this is a typo, and it should state paragraph 7.6.6. (Document No. 50 at 5 n.7; Document No. 44 at 3).

[5] As a result of being required to remove all of the paint, including the sound or non-deteriorated paint, BSR claims that one of its painting subcontractors, The Aulson Company ("Aulson") sued BSR, resulting in a settlement of $615,000. (Document No. 44 at 3).

[6] BSR's breach of contract claim includes additional allegations which are not relevant to these motions.

of Item 150," and by failing to "[c]ompensate BSR for its additional costs incurred due to the increased scope of the surface preparation and painting work required to remove sound or non-deteriorated paint." (Document No. 44 at 6).

**Standard of Review**

"It is well settled that a contract to repair a vessel is maritime."[7] *Alcoa S.S. Co. v. Charles Ferran & Co.*, 383 F.2d 46, 50 (5th Cir. 1967). "[T]he construction of a maritime contract is governed by federal, not state, law." *Transcon. Gas Pipe Line Corp. v. Mobile Drilling Barge Mr. Charlie*, 424 F.2d 684, 691 (5th Cir. 1970). "Applying federal law in the contract context includes looking to 'principles of general contract law' that can be found in treatises or restatements of the law." *Int'l Marine, L.L.C. v. FDT, L.L.C.*, 619 F. App'x 342, 349 (5th Cir. 2015) (citation omitted).

"A basic principle of contract interpretation in admiralty law is to interpret, to the extent possible, all the terms in a contract without rendering any of them meaningless or superfluous." *Chembulk Trading LLC v. Chemex Ltd.*, 393 F.3d 550, 555 (5th Cir. 2004) (citations omitted). "The terms of a maritime contract are given their plain meaning unless the provision is ambiguous." *Weathersby v. Connoco Oil Co.*, 752 F.2d 953, 956 (5th Cir. 1984). If a contract's "language as a whole is clear, explicit, and leads to no absurd consequences, and as such it can be given only one reasonable interpretation," it is not ambiguous. *Chembulk Trading*, 393 F.3d at 555 n.6. "Under federal maritime law, 'a court may not look beyond the written language of [a contract] to determine the intent of the parties unless the disputed contract provision is ambiguous.'" *Int'l Marine*, 619 F. App'x at 349 (citing *Corbitt v. Diamond M. Drilling Co.*, 654

---

[7] There is no dispute among the parties that the Contract is a maritime contract and the Court agrees. Furthermore, the Contract provides that Texas law applies where no federal common law exists: "This contract shall be governed by and construed in accordance with General Maritime law, as applicable and thereafter, the laws of the State of Texas without regard to conflict of laws." (Document No. 49, Exhibit J, at 20).

F.2d 329, 332-33 (5th Cir. Unit A Aug. 1981)).

Summary judgment under Federal Rule of Civil Procedure 56(c) is appropriate when, viewing the evidence in the light most favorable to the nonmovant, the court determines that "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." The interpretation of maritime contract terms is a matter of law. *One Beacon Ins. Co. v. Crowley Marine Servs., Inc.*, 648 F.3d 258, 262 (5th Cir. 2011).

**Discussion**

The Court agrees with OSI that, under the plain meaning of Item 150, BSR provided pricing to perform surface preparation of the entire vessel. The Pricing Breakdown in Item 150 clearly lists 269,538 square feet next to item "UHPWJ SSPC-SP-12 WJ-2 M" (Document No. 49, Exhibit B, at 150-9), as do the Pricing Breakdown and Work Item Index containing BSR's bid. (Document No. 49, Exhibit E, at OSI 25362, BSR0012792). Even if these figures were only a "best estimate" of the costs, the figures clearly contemplated full surface preparation of the entire vessel, and BSR should have bid accordingly. *Appeal Off Atl. Dry Dock Corp.*, ASBCA No. 54936, 13 B.C.A. (CCH) ¶ 35344 (June 20, 2013) ("It is the nature of a fixed-price contract to place the risk on a bidder that exercises its business judgment to establish its price and during performance finds its price to be low."). The survey in Paragraph 7.6.6 and the changes to the price, contemplated in the Note to the Pricing Breakdown, do not change the fact that BSR bid on all 269,538 square feet. Any changes to the square footage or price as a result of the survey were not guaranteed. Paragraphs 7.6.6 and 7.6.7 contemplate an agreement *in the future* among the Contractor, the PPG Representative, and the OSI Port Engineer as to the amount of square footage. (Document No. 49, Exhibit B, at 150-4). Also, the Note provides: "Prices for *any*

changes will be prorated based on the unit prices quoted on this table for either increases or decreases in the *scope of work*." (Document No. 49, Exhibit B, at 150-9) (emphasis added). Furthermore, the Contract provides that "The scope of all Work is to be limited to that laid out in the Work Package for each respective Vessel and no additions or changes are to be made without the specific approval of OSI's representative." (Document No. 49, Exhibit J, at 5). Therefore BSR had no guarantee that a change order would be issued under the Note, without the approval of an OSI representative.[8]

BSR's claim that the "express terms of Item 150 required surface preparation and recoating of areas the parties agreed were deteriorated" and that "Item 150 did not require BSR to remove the existing coatings in areas where coatings were intact" is not supported by the language in Item 150. (Document No. 50 at 15). Item 150 does not include any language limiting full surface preparation to deteriorated areas. Paragraph 7.6.6's referral to areas "requiring removal" does not include any language to suggest that the areas "requiring removal" would only

---

[8] If, as BSR argues, agreement via the survey was required, and not a mere possibility, then that portion of Item 150 would likely fail due to uncertainty. The Restatement (Second) of Contracts states:
> (1) Even though a manifestation of intention is intended to be understood as an offer, it cannot be accepted so as to form a contract unless the terms of the contract are reasonably certain.
> (2) The terms of a contract are reasonably certain if they provide a basis for determining the existence of a breach and for giving an appropriate remedy.
> (3) The fact that one or more terms of a proposed bargain are left open or uncertain may show that a manifestation of intention is not intended to be understood as an offer or as an acceptance.

Restatement (Second) of Contracts § 33 (1981). Item 150 would therefore be uncertain as to the square footage requiring full surface preparation, an aspect of the specification that is clearly not "incidental or collateral." *Id*. at cmt. a. *See also* cmt. f ("The more important the uncertainty, the stronger the indication is that the parties do not intend to be bound; minor items are more likely to be left to the option of one of the parties or to what is customary or reasonable. Even when the parties intend to enter into a contract, uncertainty may be so great as to frustrate their intention."); *Fischer v. CTMI, L.L.C.*, 479 S.W.3d 231, 237 (Tex. 2016), *reh'g denied* (Feb. 19, 2016) ("It is well settled law that when an agreement leaves material matters open for future adjustment and agreement that never occur, it is not binding upon the parties and merely constitutes an agreement to agree.") (citation omitted). The fact that BSR's interpretation of Item 150 would make it uncertain suggests that its interpretation is not reasonable. *F.W.F., Inc. v. Detroit Diesel Corp.*, 494 F. Supp. 2d 1342, 1363 (S.D. Fla. 2007), *aff'd*, 308 F. App'x 389 (11th Cir. 2009) (Plaintiff's interpretation of maritime contract was not adopted, partially because it "would possibly render the settlement agreement too indefinite for enforcement.") (citing Restatement (Second) of Contracts § 33). *See also Fischer*, 479 S.W.3d at 237 ("We will find terms to be sufficiently definite whenever the language is reasonably susceptible to that interpretation."); *Dahlberg v. Holden*, 150 Tex. 179, 183, 238 S.W.2d 699, 701 (1951) ("[I]t is a rule universally recognized that if an instrument admits of two constructions, one of which would make it valid and the other invalid, the former must prevail.").

be areas where the paint had deteriorated or was not fully intact. BSR had the opportunity to submit questions and comments before submitting its offer to OSI, but never attempted to specify that full surface preparation would be done only on deteriorated surfaces. (Document No. 49, Exhibit A, at OSI 25365, BSR 0000915).

BSR also argues that Item 150 only requires surface preparation and recoating in limited areas, because "OSI unmistakably required certain tasks to be performed on the entire freeboard and superstructure." (Document No. 50 at 16). Therefore, it could have required surface preparation and recoating for the entire freeboard and superstructure as well. *Id*. at 16-17. However, this argument fails. The fact that OSI used the word "all" in other sections of Item 150 does not change the meaning of the relevant sections. Paragraph 7.6.6 left open the possibility that full surface preparation would not be done on all 269,538 square feet, but it did not guarantee that would be the case.

Additionally, BSR argues that "the Note references 'spot coating' which would be meaningless if full surface preparation [were] required," because it is a technique used when less than the entire surface area is removed. *Id*. at 5, 16. In response, OSI argues that the reference to spot coating was merely a contingency. (Document No. 53 at 14). The Court agrees that the reference to spot coating could be a contingency as argued by OSI. Furthermore, the mere reference to spot coating, in relation to a change order which was never issued, cannot change the plain meaning of Item 150.

Furthermore, BSR notes that Paragraph 7.6.12 references "feathered edges." (Document No. 50 at 6). Because "feathering is a technique for joining areas where coating are taken down to bare metal with other areas where paint is not fully removed," it is not necessary "where all areas undergo surface preparation because no areas of differential paint thicknesses exist." *Id*. In

response, OSI argues that "when building the surface back up one must feather the edges between areas being painted and areas not yet prepared." (Document No. 53 at 14). Paragraph 7.6.12 says in full: "Upon completion of the surface preparation, the surfaces to be painted shall be inspected by the OSI Port Engineer and the PPG Representative. This inspection will include surface conditions, *such as* damage, feathered edges, visible and non-visible contaminants." (Document No. 49, Exhibit B, at 150-5). This section does not guarantee that feathered edges will be present, but merely lists them as an example of an item which may be relevant to the inspection of the surface conditions. Therefore the mention of feathered edges has no bearing on the issue at hand.

As described above, the plain meaning of Item 150 is clear, and therefore it is not ambiguous. *Chembulk Trading*, 393 F.3d at 555 n.6. "An ambiguity in a contract cannot be created by the mere assertions of a party to it" and "[a] contract is not rendered ambiguous by the mere fact that the parties may not agree upon the proper construction to be given it." *Vreeland v. Fed. Power Comm'n*, 528 F.2d 1343, 1351 (5th Cir. 1976) (citations omitted). A contract is also not ambiguous due to "uncertainty or lack of clarity in the language chosen by the parties." *Breaux v. Halliburton Energy Servs.*, 562 F.3d 358, 364 (5th Cir. 2009) (citation omitted). "Where the written instrument is so worded that it can be given a certain definite legal meaning or interpretation, then it is not ambiguous, and this Court will construe the contract as a matter of law." *Id*. When a contract is not ambiguous, the Court cannot look beyond its written language to determine the intent of the parties. *Int'l Marine*, 619 F. App'x at 349. Therefore, each party's arguments relating to parol evidence are not relevant,[9] and, under the plain meaning of Item 150,

---

[9] This includes the parties' arguments about the Petersen Report, and BSR's argument that OSI is required to "comply with COMSCINST 4750.2 Series 'Preservation Instructions for MSC Ships.'" (Document No. 50 at 6) (citing Document No. 50-20, OSI-MSC Government Vessel Operating Agreement, at 25270-1). Section 4750.2 specifically states that it is "*not a contractual document* and is not to be implied or cited as such in any

BSR's claim of breach of contract relating to surface preparation fails.

**Conclusion**

Therefore, the Court hereby

ORDERS that OSI's Motion for Partial Summary Judgment (Document No. 49) is GRANTED and BSR's Motion for Partial Summary Judgment Related to Surface Preparation (Document No. 50) is DENIED. BSR's claim of breach of contract, relating to surface preparation, is DISMISSED.

SIGNED at Houston, Texas, this 26th day of May, 2016.

_____
MELINDA HARMON
UNITED STATES DISTRICT JUDGE

---

specifications with the exception of referencing the approved coatings…." (Document No. 53, Exhibit V, at OSI 5106). The fact that Section 4750.2 was made a reference in Item 150 does not make it a contractual document; it is merely a "guideline," as it states. *Id*.